**STATE, Plaintiff, v. DAVIS et, Defendants.**

Cincinnati Municipal Court.

Nos. 31425, 31426, 31427, 31428, 31429, 31430, 31431, 31432.

Decided December 10, 1959.

Lyle W. Castle, Paul N. Gorman, Asst. City Solicitors, Cincinnati, for plaintiff.
Edgar I. Shott, Jr., James G. Andrews, Jr., for defendants.

## OPINION

By BETTMAN, J.

There are eight defendants in the above matter, four men and four women. The female defendants are charged with engaging in prostitution, lewdness or assignation in violation of §2905.27 (E) R. C. The male defendants are charged with aiding and abetting prostitution, lewdness or assignation in violation of the same section. The cases were all tried together before this Court sitting without a jury.

The evidence showed that at about 10:00 or 11:00 A. M., on August 10, 1959, each of the female defendants was found by the police in a hotel room with one of the male defendants. All defendants were in various stages of undress. Some of the defendants admitted having had sexual intercourse with his or her partner and from their state of undress it could be inferred that the other couples also had or planned to have some sexual relations. The evidence further showed that the parties had all met each other the preceding evening at a night club where the male defendants were performing. Three of the girls had driven down from Hamilton, Ohio, to hear the men sing. Although there was some conflict of evidence, it could generally be said that each of the defendants knew his or her partner's first name but not the last. It was not entirely clear whether the arresting officers had inquired concerning last names.

There was little or no evidence that the male defendants had given the female defendants any money and certainly no evidence in any of the four situations from which a trier of fact could conclude beyond a reasonable doubt that money had changed hands.

The arresting officers testified that their investigation had not revealed any criminal record of any of the accused. No testimony was introduced as to the character or reputation of any of the defendants or that the officers had any previous contact with any of them. The defendants did not take the stand.

The broad issue here presented is, were the defendants guilty of engaging in or aiding and abetting prostitution, lewdness or assigna-

tion in violation of §2905.27 R. C. In this connection §2905.26 R. C., gives the following definitions:

"(A) 'Prostitution' includes the offering or receiving of the body for sexual intercourse for hire and the offering or receiving of the body for indiscriminate sexual intercourse without hire.

"(B) 'Lewdness' includes any indecent or obscene act.

"(C) 'Assignation' includes the making of any appointment or engagement for prostitution or lewdness, or any act in furtherance of such appointment or engagement."

The facts present the Court therefore two legal issues:

1. What is the legal meaning and effect of the word "lewdness" in the phrase "prostitution, lewdness, or assignation" in §2905.27 R. C., as elaborated by the definition in §2905.26 R. C.?

2. What is the meaning of the word "indiscriminate" in the definition of prostitution?

I

In making these determinations certain rules of statutory construction must be kept in mind. First of all, it has always been basic to our concept of justice that penal statutes are to be strictly construed.[1] As stated by the Supreme Court of Ohio in Hirn v. State:

"It is well settled that penal statutes must receive a strict interpretation, and must not be extended in their operation beyond the manifest intention of the legislature. The subject matter and the reason and effect of a law, must be looked to in giving it a construction;"

It would seem appropriate therefore in the interest of ascertaining the intent of the Ohio Legislature in enacting §§2905.26 and .27, R. C., to examine the historical and statutory background.

These sections became part of the law of Ohio on June 23, 1919, when the Ohio Legislature enacted a bill entitled "To Further Supplement §13031 GC, by the Enactment of Sections . . ., Providing for the Suppression of Prostitution."[2] Sec. 13031 GC, had been in effect since 1831, and since its last major amendment in 1888 had done no more than make unlawful the maintenance of a house of ill fame.[3] There was no provision of law making either prostitution or the aiding or abetting of a prostitute an offense. This was typical of the situation generally throughout the Country. In a book entitled "Prostitution in the United States" Dr. Howard B. Woolston says:[4]

"It was not until the early years of the twentieth century that the whole country awoke to the disgrace of a system of commercialized vice which, unknown to the vast majority of our citizens, had grown up in our midst.

---

1. Sec. 1.11 R. C.; Hall v. State, 20 Ohio 8 (1851); Hirn v. State, 1 Oh St 15 (1852); 15 O. Jur. (2d) 253, "Criminal Law" Sec. 20, and cases cited therein.

2. 108 Laws of Ohio, Pt. 1, pg. 730.

3. 85 Ohio Laws 137.

4. "Prostitution in the United States" by Howard B. Woolston, Ph. D.. The Century Co., New York, 1921, pp. 31, 33,

"We were practically without laws aimed at the exploiters of women, such as panderers, procurers, pimps and others who make vice a busines.

". . . The circumstances attending the entrance of the United States into the World War brought home to the American people as nothing in our previous history had ever done, the menace of prostitution and venereal diseases to the young manhood of our country."

It was in response to this situation that Ohio, along with many other states, then enacted laws to deal seriously with commercialized vice. It must be concluded, therefore, that this was the evil which §§2905.26 and .27 R. C., were designed to meet. An analysis of the numerous other provisions of §2905.27 R. C., confirms the conclusion that the elimination of commercialized vice was the object of the enactments.

## II

In the light then, of the principle of strict construction of penal statutes; the history of the enactment of the law; its announced purpose to suppress prostitution; and its other provisions dealing with prostitution; what does the word "lewdness" mean?

After a considerable analysis of the case law, dictionaries and texts on the subject the Court has concluded that "lewdness" in the sentence "Engage in prostitution, lewdness, or assignation" means sexual acts by a male or female which are either indiscriminate or involve the giving or receiving of money.

In arriving at this conclusion the Court is impelled by the virtual interchangeability of the words "prostitution" and "lewdness" throughout the authorities. For an example, Bouvier[5] defines prostitution as "The common lewdness of a woman for gain. The act of permitting a common and indiscriminate sexual intercourse for gain." Ballentine[6] states, " 'Prostitution' and 'lewdness' when used distinctly in a penal statute applying to both sexes are not synonymous words. If a man and woman resort to a house of ill fame for the purpose of sexual relations, her purpose is 'prostitution,' and his, 'lewdness.' " Webster[7] defines a prostitute as "A woman given to indiscriminate lewdness." · Mr. Eustace Chesser in a recent book dealing with prostitution in England says, "For legal purposes in this country the term 'common prostitute' is taken to mean a woman who offers her body for acts of lewdness for payment."[8] Corpus Juris Secundum summarizes, "Prostitution . . . has been defined as common lewdness of a woman for gain, the act or practice of permitting a common and indiscriminate intercourse for hire, or the offering of the body to indiscriminate lewdness for hire . . ." In Kavas v. State,[9] the Court of Appeals of Cuyahoga County in reference to a defendant who had illicit sexual intercourse, used the words "prostitution" and "lewdness" without distinction.

---

5. Bouvier's Law Dictionary, Baldwin's Edition, 1934 Ed.

6. Ballentine's Law Dictionary, 1954 Supp to 1948 Ed.

7. Webster's New International Dictionary, 2nd Ed., unabridged.

8. "Live and Let Live," Eustace Chesser, Philosophical Library, Inc., New York, 1958, pg. 96.

9. 33 O. L. Rep. 298 (1929).

The words "indecent or obscene" in §2905.26 R. C., add nothing to the breadth of the concept of lewdness. They are simply modifying adjectives. Lewd acts are indeed indecent or obscene but certainly all acts which are indecedent or obscene are not lewdness. Especially are they not lewdness as the word is written in statute to suppress prostitution.

This specific point was discussed by the Supreme Court of Louisiana.[10] In a unanimous decision the Court reversed the lower Court's conviction of the defendants who had been living together in a state of fornication. They had been charged under an ordinance making it unlawful to use a hotel, house, room, etc. "for the purpose of prostitution, assignation or other lewd or indecent act." The Court stated:

"the words 'or other lewd or indecent act,' in the ordinance in question, add nothing to the ordinance, except to make plain the meaning of 'prostitution' and 'assignation.'

"Our opinion is that the object and purpose of the ordinance in question is very plainly confined to the suppression of places that might be injurious to the health or morals of the soldiers in or about the City of Shreveport; i. e. places of prostitution or assignation. Although living in open and notorious concubinage might be regarded as a lewd and indecent affair, offensive to public morals, it is not the lewd or indecent state that this ordinance was intended to suppress."

It requires little imagination to think of any number of indecent or obscene acts which the Legislature would have been shocked to have thought they were making punishable by a one year jail sentence.

The word "lewd" is used in the law in numerous connections. There are many statutes and cases dealing with "open, gross, or notorious lewdness"; "lewd language"; "lewdness" as a defense to statutory rape; "lewd pictures or publications"; and others. It is careless thinking to simply take a definition of "lewdness" as it is used in one type of statute or factual situation and attempt to use it as a Procrustean bed into which all situations are thenceforth fitted. Nor can one simply do as did the Supreme Court of Arkansas and reason as follows: lewdness includes any indecent or obscene act; the dictionary gives morally offensive as a definition of indecent; it is certainly morally offensive for a man and woman not married to each other to spend a night in a hotel; therefore they are guilty of prostitution, lewdness and assignation.[11] The illogicality of such mechanical statutory construction is clear when one asks oneself, how many morally offensive acts there are which the law, in its wisdom, has left to the jurisdiction of the church and the home.

There has always been a distinction between crime and sin. The criminal law must be based upon the moral law, but there are fundamental reasons why all moral offenses should not be designated as

---

10. City of Shreveport v. Wilson, 145 La. 906, 83 So. 186 (1919).

11. Dillard v. Arkansas, 226 Ark. 720, 293 S. W. (2d) 697 (1956). For the exact opposite conclusion see State v. Brenner, 132 N. J. L. 607, 41 A. (2d) 532 (1945), in which the highest court of New Jersey unanimously reversed a conviction even though the statute specifically proscribed "secret indecency."

crimes. The purpose of the criminal law is to maintain and safeguard the common good, not to punish individuals for their private sins.[12]

It is noteworthy to recall in this connection that individual acts of adultery or fornication were not punishable offenses at common law, nor are they proscribed by the law of Ohio. As at common law, Ohio law has provided since 1831 for the punishment of persons who openly cohabit in a state of adultery or fornication, but this has never been deemed to cover illicit intercourse where the parties do not live together to the affront of the neighborhood. By dicta in State v. Brown[13] the Supreme Court established that a single act of sexual intercourse is not a violation. This interpretation of the statute has been accepted by the Courts and the Legislature of Ohio for the 80 years since the Brown case. It is also the law in a great many other jurisdictions of the Country.[14]

---

12. In this connection the Court would call attention to the report made to the British Home Office in London by a committee of seven Catholic clergymen and laymen, appointed by the late Bernard Cardinal Griffin, Archbishop of Westminster. Their report set forth the following principles, among others, as being applicable to prostitution:

"It is not the business of the State to intervene in the purely private sphere but to act solely as the defender of the common good. Morally evil things so far as they do not affect the common good are not the concern of the human legislator."

"Sin as such is not the concern of the State but affects the relations between the soul and God."

"Attempts by the State to enlarge its authority and invade the individual conscience, however high-minded, always fail and frequently do positive harm."

"It should . . . be clearly stated that penal sanctions are not justified for the purpose of attempting to restrain sins against sexual morality committed in private by responsible adults. They . . . should be discontinued because:

"(a) they are ineffectual;

"(b) they are inequitable in their incidence;

"(c) they involve severities disproportionate to the offense committed;

"(d) they undoubtedly give scope for blackmail and other forms of corruption."

This Court is not concerned, except as a citizen, with the question of whether a law is good or bad. However, consideration of principles such as enunciated by the Committee do play a part in legislators' determinations and can therefore properly be considered in ascertaining legislative intent.

The Court has not been able to obtain a copy of the Committee's report and is indebted for the facts recited in this footnote to Hon. John M. Murtagh, Chief Magistrate of the City of New York in whose book "Cast the First Stone," published by McGraw-Hill Book Company, Inc., New York (1957), they appear at page 300.

13. 47 Oh St 102, 23 N. E. 747, 21 Am. St. 790 (1890).

14. See annotation to Robert Warner v. Indiana, 202 Ind. 479, 175 N. E. 661 (1931), in 74 A. L. R. 1357.

To return then to the definition of "lewdness" in the section in question—the legislative intent in including it could only have been to cover commercialized vice cases which might be commonly understood as such by the layman but which might slip through a strict legal definition of "prostitution." Three examples come to mind. First, prostitution is defined as offering or receiving of the body for sexual intercourse for hire and the offering or receiving of the body for indiscriminate sexual intercourse without hire. Sec. 2905.05 R. C., states: ". . . sexual intercourse is complete upon penetration." In the light of this section one could foresee that there might be difficulties in proving that there either had been or was about to be sexual intercourse, even though the parties were discovered in a most compromising position.[15] Second, an examination of medical books shows that there are other sexual acts between individuals which are not included in a strict definition of "sexual intercourse." Third, the three words "prostitution, lewdness, or assignation" are used throughout the section and in view of a definition such as Ballentine's, a legislative drafstman would want to make clear that men as well as women were covered.

An anlysis of the statutes and ordinances of many states shows that almost every law dealing with prostitution uses several or all of the words "prostitution, lewdness or assignation or any other indecent or obscene act." Since 1888, §2905.14 R. C., dealing with houses of ill fame, has contained the words, "No person shall keep a house or place of ill fame or assignation for the purpose of prostitution or lewdness, or a house or place for persons to visit for unlawful sexual intercourse or for any other lewd, obscene, or indecent purpose . . ."

Despite the general use of these words there is no Ohio decision and no decision of any other jurisdiction which has been brought to the Court's attention, except the Arkansas case mentioned above, which finds anyone guilty under such statute or ordinance except where the facts show what the law and layman consider prostitution, namely, the offering or receiving of the body for indiscriminate sexual relations with or without hire.

### III

Having concluded as a matter of fact that the prosecution has sustained the burden of proof beyond a reasonable doubt that there was an offering or receiving of the body for sexual intercourse and that it has failed to prove that any money was involved, the determination of the case rests upon the legal force and effect of the word "indiscriminate" as used in the statute and in the Court's definition of "lewdness."

Only two cases have been discovered which discuss the meaning of "indiscriminate." Although neither present the same factual problem as the matter before us, we should consider them. They are: Bates v. The State of Ohio,[16] decided by the Court of Appeals for Knox County, and State v. Poague,[17] decided by the Supreme Court of Minnesota.

---

15. Such a defense was effective in City of St. Louis v. Wyatt, Mo. App., 189 S. W. (2d) 129 (1945).

16. 27 Oh Ap 391, 6 Abs 146, 161 N. E. 344 (1927).

17. 245 Minn. 438, 72 N. W. (2d) 620 (1955).

In both these cases the defense contended that "indiscriminate" required a showing that the defendant engaged in illicit intercourse with more than one person. The defense in the case at bar makes the same argument. Such is apparently the law in New York, where it has been held that in order to establish indiscriminate sexual intercourse where no compensation is involved it is necessary to prove a prior act of submitting to such intercourse, in addition to proof of the act complained of.[18] The defense also points out, with considerable logic, that since §2905.29 R. C., specifically permits testimony of a prior conviction and of the reputation of the defendant in support of a charge of violating the section here under consideration, namely §2509.27 R. C., the Legislature must have intended to require proof of prior acts to establish "indiscriminate" conduct.

Such an interpretation, we believe, would in fact thwart the intent of the Legislature and place impediments in the way of law enforcement officers, not necessary to protect innocent persons. Its practical effect would be to virtually negate in toto the words "indiscriminate without hire" and would mean that every prosecution for engaging in prostitution would fail unless there were proof that cash had changed hands. As long as "indiscriminate" is given the strict interpretation which the law requires and proof of it is sustained beyond a reasonable doubt innocent persons are no more likely to be caught in its snare than under the "sexual intercourse for hire" clause.

In determining the legal force and effect of the word "indiscriminate" the language of the Bates case bears repetition:

"Courts in construing statutes must give effect to the intent of the lawmaking body, and seek for that intent in every legitimate way. The language of a statute is its most natural expositor; and, when the language and the words therein are susceptible of a sensible interpretation, they are not to be controlled by any extraneous considerations.

"The words and language of a statute are to be construed with reference to their manifest object.

"Therefore, if the words and language are susceptible of two constructions, one which will carry out and the other defeat such manifest object and purpose, they should receive the former construction."

The manifest and announced object of §2905.27 R. C., is to suppress prostitution. In that light the sensible interpretation of the word "indiscriminate" is its common and everyday meaning as given in Webster:[19] "That is indiscriminate which lacks, or shows the absence of selection or discrimination." It must be noted that the dictionary definition says the absence of selection—not poor or hasty selection or a selection abhorrent to others. Furthermore the prefix "in" comes from the Latin, meaning "not, non or un." In layman's language a person who indulges in "indiscriminate" intercourse is one who "will do it with anyone who comes along."

With Webster's definition in mind we should examine the facts in the two cases which discuss indiscriminate. In the Bates case the de-

18. People v. Webb, 25 N. Y. S. (2d) 554 (1941).
19. supra, note (7).

fendant's ex-girlfriend was the prosecuting witness. She testified to having had intercourse with him a number of times. The Court refused to upset his conviction for "receiving of the body for indiscriminate sexual intercourse without hire."

Such a conclusion surely perverts the clear meaning of the word "indiscriminate" and defies the avowed intent of the lawmakers. What clearer indication of selection could one have than repeatedly choosing the same girl. On the basis of its facts and its faulty legal conclusion, it furnished this Court with no precedent.

The facts of the Poague case gives us small help, but the Court's reasoning deserves our consideration. In that case the defendant ran a "date and escort club." When one of the members of the vice squad asked her to find him a girl she suggested that since no one else was available, she "take care of him herself." The price, she said would be $30.00. After he had paid the $30.00, she provided him with a contraceptive, took him into the next room and undressed.

Even in such a clear case of non-selection and even though under Minnesota law proof beyond a reasonable doubt is not required in misdemeanor cases, the Court in its opinion seemed loathe to reach a finding of guilt. Chief Justice Dell emphasized that Courts must carefully scrutinize the evidence in cases such as this where a conviction places on the defendant a stigma virtually impossible to erase.[20] The Justice set out the method of reaching his decision as follows:

"We conclude that whether a woman is a common prostitute does not depend alone upon the number of persons with whom she had illicit intercourse but rather may be judged from all the surrounding circumstances, including her acts, conduct, and utterances in determining whether she was lacking in discrimination within the commonly accepted meaning of that word in submitting to, or offering her body for, illicit sexual intercourse."

## IV

On the basis of the evidence set out at the beginning of this opinion, did the defendants exercise no selection in choosing his or her partner? The question we believe suggests its own answer. We simply do not know. On the one hand, we know that three of the girls drove from Hamilton to see the male defendants. On the other hand, so far as the evidence showed each defendant knew only his or her partner's first name. Our law requires that in considering circumstantial evidence in a criminal prosecution the particular facts and circumstances when taken together must be so convincing as to be irreconcilable with the innocence of the accused or as to admit of no other hypothesis than the guilt of the accused.[21] The facts in this case do not meet that test.

That the defendants' conduct was reprehensible, that it was loose and lustful, admits of no argument. However, this Court cannot say,

---

20. Under the Ordinances of the City of Cincinnati, as in most cities, a woman, once convicted of engaging in prostitution, can thereafter be arrested by the police as a "common prostitute" at any time and from time to time, if she appears on the street or in any public place.

21. 15 O. Jur. (2d) 631, "Criminal Law," Sec. 462.

as the law requires of it, that it has an abiding faith to a moral certainty that the defendants' acts were without any choice, selection, or discrimination. The State has consequently failed to prove its case and the defendants must be dismissed.